**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| **ANTONIO HARRIS** | **CIVIL ACTION NO. 3:21-CV-01332** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **JACOB BROWN, ET AL.** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

---

# MEMORANDUM IN SUPPORT OF THE MOTION OF JACOB BROWN TO EXCLUDE OR LIMIT THE EXPERT TESTIMONY OF WILEY LLOYD GRAFTON

## TABLE OF CONTENTS

**I. Issue Presented** ........ 1
**II. Introduction** ........ 1
**III. Statement of Facts** ........ 2
**IV. Argument** ........ 5
A. Grafton admits that his "training violation" opinions are Fourth Amendment conclusions, and *Renfroe* bars them. ........ 7
B. Calling Brown "dishonest" is a credibility judgment reserved to the jury. ........ 11
C. Grafton adopted Bethea's narrative without the investigation or the video, so his opinions lack sufficient facts or data. ........ 12
D. Grafton identified no governing standard and applied none to any act attributed to Brown. ........ 15
E. Grafton is not a physician and reviewed no medical records, so he cannot attribute injuries or cardiac risk to particular acts. ........ 18
F. Collateral accusations and post-event messages add prejudice, not expertise. ........ 19
G. The weight-not-admissibility cases do not save these opinions. ........ 20
H. The supplemental report is a late rewrite, not a correction, and Rule 37(c)(1) excludes it. ........ 21
V. Conclusion ........ 24

# TABLE OF AUTHORITIES

**Cases**

*Arnold v. Alvarado*, No. 22-3332, 2024 WL 2864392 (E.D. La. June 6, 2024) .......... 21

*Chipley v. Brownlow*, No. 3:16CV901TSL-RHW, 2019 WL 11093776 (S.D. Miss. Apr. 25, 2019) .......... 12

*In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365 (5th Cir. 2016) .......... 22, 23, 24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .......... 6

*Fetty v. City of Baton Rouge*, 518 F. Supp. 3d 923 (M.D. La. 2021) .......... 2, 9, 12, 19

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) .......... 6, 18

*Goodman v. Harris County*, 571 F.3d 388 (5th Cir. 2009) .......... 8

*Graham v. Connor*, 490 U.S. 386 (1989) .......... 8, 10, 20

*Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007) .......... 6, 18

*Holmes v. Reddoch*, No. 19-12749, 2023 WL 2742155 (E.D. La. Mar. 31, 2023) .......... 21

*Jones v. Lollis*, No. 18-885, 2020 WL 3469105 (M.D. La. June 25, 2020) .......... 9

*Joseph v. Doe*, No. 17-5051, 2021 WL 2313475 (E.D. La. June 7, 2021) .......... 21

*Kelly v. Stassi*, No. 18-263, 2022 WL 263565 (M.D. La. Jan. 27, 2022) .......... 2, 9, 15, 16

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .......... 6

*MCI Commc'ns Serv., Inc. v. KC Trucking & Equip., LLC*, 403 F. Supp. 3d 548 (W.D. La. 2019) .......... 6, 21

*Nagle v. Gusman*, No. 12-1910, 2016 WL 9411376 (E.D. La. Feb. 29, 2016) .......... 11

*Nale v. Finley*, 505 F. Supp. 3d 635 (W.D. La. 2020) .......... 2, 11, 15

*Owen v. Kerr-McGee Corp.*, 698 F.2d 236 (5th Cir. 1983) .......... 8

*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002) .......... 20

*Renfroe v. Parker*, 974 F.3d 594 (5th Cir. 2020) .......... passim

*Richman v. Sheahan*, 415 F. Supp. 2d 929 (N.D. Ill. 2006) .......... 12

*Ritchie v. City of Pineville*, No. 1:11-CV-2081, 2014 WL 11379574 (W.D. La. Oct. 27, 2014) .......... 21

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546 (5th Cir. 1996) .......... 22

*SRP Env't Co. v. Claremont Prop. Co.*, No. 23-1475, 2026 WL 1994079 (W.D. La. May 22, 2026) .......... 6

*In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 26 F.4th 256 (5th Cir. 2022) .......... 13

*United States v. Firmin*, No. 25-63, 2026 WL 983250 (W.D. La. Apr. 12, 2026) .......... 20

*United States v. Williams*, 343 F.3d 423 (5th Cir. 2003) .......... 8

*Valencia v. Davis*, 836 F. App'x 292 (5th Cir. 2020) ........ 8
*In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 (E.D. La. 2005) ........ 19

**<u>Rules</u>**

Fed. R. Civ. P. 26(a)(2)(B) ........ 21
Fed. R. Civ. P. 26(e) ........ 21, 22
Fed. R. Civ. P. 37(c)(1) ........ 21, 22, 24
Fed. R. Evid. 104(a) ........ 6, 24
Fed. R. Evid. 401 ........ 20
Fed. R. Evid. 402 ........ 20
Fed. R. Evid. 403 ........ 20
Fed. R. Evid. 404 ........ 19
Fed. R. Evid. 702 ........ passim
Fed. R. Evid. 703 ........ 12, 13, 14, 15
Fed. R. Evid. 704(a) ........ 8

**<u>Other Authorities</u>**

Fed. R. Evid. 702 advisory committee's note to 2000 amendment ........ passim
Fed. R. Evid. 703 advisory committee's note to 2000 amendment ........ 12, 13, 14, 15
Fed. R. Evid. 702 advisory committee's note to 2023 amendment ........ passim

## I. Issue Presented

Rule 702 lets a police-practices expert explain professional standards to the jury; it does not let him deliver the verdict. Wiley Lloyd Grafton testified that when he says the troopers "violated training," he is "actually opining that they violated the Fourth Amendment." He also called Trooper Jacob Brown "dishonest." And he conceded that his surrender-and-resistance conclusions repeat an investigator's account he never possessed in full. May Grafton give those opinions against Brown as expert testimony?

## II. Introduction

No. Grafton's opinions rest on borrowed facts and end in legal conclusions. Grafton is a former federal agent retained to say that four state troopers used excessive force. He never had the investigation his report says he reviewed. His video was two news clips found by typing "Antonio Harris, state police" into an internet search. His "training violation" opinion, he said, means the troopers violated the Fourth Amendment. So "it doesn't matter what the standards are because they would have been violated, as well." Ex. 2, Grafton Dep. 37:23–25, 46:19–47:7, 68:14–24, 159:6–24.

The Court should exclude his opinions for three reasons. First, they are legal conclusions. The Fifth Circuit holds that "[r]easonableness under the Fourth Amendment . . . is a legal conclusion" no expert may supply. It affirmed exclusion of a report that, like Grafton's, dressed that conclusion in the language of "use of force training and standards." *Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020).

Second, they decide credibility. Grafton calls Brown "dishonest." He took the investigator "at his word just from his report." And he reasons that an investigator who faulted four troopers must have been right. Ex. 1, Grafton Report 6–7; Ex. 2 at 53:15–16, 70:12–23. This Court has held

that an expert "may not opine on another witness's credibility." *Nale v. Finley*, 505 F. Supp. 3d 635, 645 (W.D. La. 2020) (Doughty, J.).

Third, they rest on no identified standard and on insufficient facts. Grafton condemned all force without naming the standard that governed any act attributed to Brown. He built his surrender-and-resistance conclusions on Investigator Bethea's narrative, without the investigation itself or the full video. Ex. 2 at 48:21–23, 126:4–12, 175:1–176:22, 186:11–187:2.

The supplemental report confirms all three reasons. Grafton dated it September 10, 2026, after his deposition. The July 24 order left passed disclosure deadlines in place. Doc. 123 at 15. It reached Brown's counsel the day this motion was due. He writes that the new materials gave him "no information which would change or alter my opinions." Ex. 5 at 2, 6–9. *Kelly* rejected that same relabel. *Kelly v. Stassi*, No. 18-263, 2022 WL 263565, at *2 (M.D. La. Jan. 27, 2022).

Brown does not dispute that Grafton has substantial general law-enforcement experience. The issue is whether that experience qualifies and enables him to give these particular opinions on the bases disclosed. The Middle District drew that line for this expert. It excluded all four of Grafton's case-specific opinions and confined him to "applicable standards and well-established police policy and procedure." *Fetty v. City of Baton Rouge*, 518 F. Supp. 3d 923, 930, 934 (M.D. La. 2021). Brown asks for the same ruling. Exclude Opinions One, Two, and Three, in both reports, as offered against him. Confine any remaining testimony to disclosed general police standards. The Court can grant that relief without deciding whose account of the arrest is true.

## III. Statement of Facts

Grafton says his training opinion is a Fourth Amendment opinion. Asked whether his opinion that the troopers "violated training" means they violated the Fourth Amendment, Grafton answered, "Yes." Ex. 2, Grafton Dep. 37:23–25. He had just explained why. "[I]t wouldn't matter

what training they had," because "[t]hat training would follow the objectively reasonable requirements of the court." *Id.* at 37:10–16. The "cornerstone" of his opinion, he agreed, is that the officers "violated the Fourth Amendment by using excessive force." *Id.* at 68:14–24.

The arrest was investigated twice. Troopers arrested Antonio Harris on May 23, 2020. Ex. 1. Investigator Bethea investigated the arrest and wrote a report. Ex. 2 at 171:21–172:3. A separate administrative investigation, IA 21-005, was discontinued in March 2021. It ended "prior to conducting any interviews," after Brown resigned. Ex. 4 at HARRIS2788.

Grafton's report attributes one act to each trooper. Grafton issued his report on November 23, 2025. Ex. 1. It attributes a different act to each trooper: Brown's alleged hair-pulling and downward pressure, Harper's striking with a fist holding a flashlight, and DeMoss's lifting Harris by his hair. Ex. 1 at 4–5. The report lists an LSP investigation and use-of-force policy among the materials reviewed. *Id.* at 1–2. It then states three numbered opinions.

Opinion One concerns documentation and honesty. The troopers "failed to properly document this event by failing to document the force used on Antonio Harris." *Id.* at 5. Grafton then declares that all force was excessive and calls Brown dishonest. *Id.* at 6–7.

Opinion Two concerns force and training. The officers "used excessive force that was not necessary or reasonable, all in violation of their police academy training." *Id.* at 7. Grafton applies that conclusion to tasing, hitting, and lifting Harris by his hair. He assumes Harris had surrendered. *Id.* at 7–8.

Opinion Three concerns TASER training. A trooper "violated his Taser training when he activated the Taser against Antonio Harris when Mr. Harris was not resisting when being taken into custody." *Id.* at 8. The opinion does not identify Brown as the TASER user. *Id.* The report

also attributes pain and injuries to the alleged abuse. And it criticizes later mobile-data-terminal messages. *Id.* at 8–9.

Grafton took Bethea at his word. Grafton acknowledged that he did not possess the investigative report his report lists. He had the arrest document quoting it. He agreed that listing the investigation as reviewed was an error. Ex. 2 at 159:6–24. He "took Sergeant Bethea at his word just from his report." *Id.* at 53:15–16. The videos his report lists were news clips from an internet search, under two minutes of Harris footage. *Id.* at 46:19–47:7, 48:21–23, 126:4–12. He had not viewed the entire arrest sequence, and his surrender-and-resistance opinions repeated Bethea's investigation. *Id.* at 186:11–187:2.

Brown's conduct, in Grafton's words, is one act. Asked to identify the force Brown used, Grafton read Bethea's sentences. He then agreed that "the only force that you are aware of is the application of a flashlight to the back and head area." Ex. 2 at 175:1–176:8, 177:16–20. He agreed that the description was of pressing, not a strike. *Id.* at 176:5–13, 177:21–178:1. The only hair contact he knew of was DeMoss lifting Harris to his feet. *Id.* at 174:6–9.

The supplemental report arrived after the deadlines that governed expert disclosure. The Scheduling Order set May 27, 2026 as the expert-deposition deadline. Doc. 93. A later order extended the discovery cutoff only to May 29, 2026, and left all other deadlines in place. Doc. 100. Grafton was deposed on May 22, 2026. Ex. 2 at 1. On July 24, 2026, the Court vacated that schedule, reset discovery completion for September 4, 2026, and reset the *Daubert* and expert-deposition deadlines for September 11, 2026. Doc. 123 at 15. "All other deadlines which have passed shall be shown as such." *Id.* That sentence left expired expert-disclosure deadlines where they were. It later confirmed that discovery was reopened only for the depositions of Gustave Bethea, Greg Meyer, and Darrell Bradley, and for responses to written discovery already

propounded. Doc. 128. Discovery was "not otherwise reopened." *Id.* Grafton dated the supplemental report September 10, 2026, and faxed it that afternoon. Ex. 5 at 1, 11. The *Daubert* deadline was the next day. Doc. 123 at 15.

The supplement changes the words, not the opinions. It states that on August 10, 2026, Grafton "received additional information from counsel": the troopers' body-worn and in-car recordings, a deputy's recording, and "Arrest Documents of State Police." Ex. 5 at 1–2. It again lists the LSP investigation among the materials reviewed for the first report. *Id.* at 2. It states: "I saw no information which would change or alter my opinions." *Id.* Its factual section reproduces Bethea's report, including Bethea's statements about Brown. *Id.* at 4–5. It restates the three opinions in new terms, compared in Part IV.A, and describes no act of Brown's from the recordings. *Id.* at 6–9.

The exhibits are offered for what they show about the opinions, not for the truth of every assertion in them. Exhibit 1 is the November 23, 2025 report; Exhibit 2, the Grafton deposition; Exhibit 3, the Harris deposition; Exhibit 4, the IA 21-005 Internal Affairs Review memorandum, Bates HARRIS2787–2788; Exhibit 5, the September 10, 2026 supplemental report. Transcript citations use printed pages and lines.

## IV. Argument

Plaintiff bears the burden, and the Court decides whether he has met it. Expert opinion is admissible only if "the proponent demonstrates to the court that it is more likely than not" that the testimony meets four requirements. They are help to the jury, "sufficient facts or data," "reliable principles and methods," and "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Whether those elements are met "is a preliminary question for the

district court to decide under Federal Rule of Evidence 104(a)." *SRP Env't Co. v. Claremont Prop. Co.*, No. 23-1475, 2026 WL 1994079, at *1–2 (W.D. La. May 22, 2026).

Courts that treated the sufficiency of an expert's basis, or the application of his method, as questions of weight made "an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Such challenges do not "always go to weight." *Id.* The Court first decides whether Plaintiff has met each requirement. Only then do the remaining attacks go to weight. *Id.* Many decisions applying the old rule predate the amendment. *See, e.g., MCI Commc'ns Serv., Inc. v. KC Trucking & Equip., LLC*, 403 F. Supp. 3d 548, 556–57 (W.D. La. 2019).

*Kumho Tire Co. v. Carmichael* applies that gatekeeping to experience-based testimony. 526 U.S. 137, 147–52 (1999). The question is whether Grafton explained "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–95 (1993). When the only link between the facts and the conclusion is the expert's say-so, the Court may exclude the opinion. *General Electric Co. v. Joiner*, 522 U.S. 136, 146–47 (1997). The Fifth Circuit affirmed exclusion on that ground where a police expert offered "little more than personal assurances based on his police experience." *Hathaway v. Bazany*, 507 F.3d 312, 318–19 (5th Cir. 2007).

Each challenged opinion fails at least one requirement. The chart maps the defect and the ruling requested:

| Challenged opinion | Source | Principal defect | Requested ruling |
|---|---|---|---|
| Opinion One (documentation; Brown "dishonest"; account "completely untrue") | Ex. 1 at 5–7; Ex. 5 at 6–7 | Credibility judgment; no documentation standard identified | Exclude as offered against Brown (Parts IV.B, IV.D) |
| Opinion Two (all force excessive / "unnecessary"; training violated) | Ex. 1 at 7–8; Ex. 5 at 7–9 | Admitted Fourth Amendment conclusion ("it doesn't matter what the standards are"); adopts Bethea's narrative; no standard applied to Brown's one act | Exclude as offered against Brown (Parts IV.A, IV.C, IV.D) |
| Opinion Three (TASER training) | Ex. 1 at 8; Ex. 5 at 9 | No TASER manual consulted; thought one person used a TASER; does not identify the trooper | Exclude as offered against Brown (Part IV.D) |
| Failure to intervene ("excess of force") | Ex. 5 at 9 | New legal conclusion; rests on "generalized policing practice," not any LSP policy; no officer identified | Exclude (Parts IV.A, IV.D) |
| Injury and cardiac attributions | Ex. 1 at 8; Ex. 5 at 9 | No medical records reviewed; not a physician | Exclude (Part IV.E) |
| Collateral accusations; post-event messages | Ex. 2 at 167:14–169:24; Ex. 1 at 8–9; Ex. 5 at 10 | No expert value; unfair prejudice | Exclude (Part IV.F) |
| General police standards and practices | — | Admissible only on a disclosed standard, stated assumptions, and a supported application to Brown | Confine to disclosed general practices; exclude case-specific application |

### A. Grafton admits that his "training violation" opinions are Fourth Amendment conclusions, and *Renfroe* bars them.

In *Renfroe*, the plaintiff's police expert opined that a deputy's force "was unnecessary and objectively unreasonable." He added that it "violated well-established law enforcement use of force training and standards." 974 F.3d at 598. The Fifth Circuit affirmed exclusion of the report.

Experts "cannot 'render conclusions of law' or provide opinions on legal issues." And "[r]easonableness under the Fourth Amendment or Due Process Clause is a legal conclusion." *Id.* at 598 (first quoting *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009); then quoting *United States v. Williams*, 343 F.3d 423, 435 (5th Cir. 2003)). "It is therefore error to allow expert testimony on whether an officer used unreasonable force." *Id.*

Rule 704(a) does not change that result. It lets an admissible opinion embrace an ultimate issue. But "allowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). Nor does recasting the conclusion as a departure from police standards help; the Fifth Circuit affirmed exclusion of a report recast that way. *Valencia v. Davis*, 836 F. App'x 292, 299–300 (5th Cir. 2020).

Grafton's opinions are the same conclusion. Asked, "So when you say they violated training, you are actually opining that they violated the Fourth Amendment?" he answered, "Yes." Ex. 2 at 37:23–25. His report invokes *Graham v. Connor*, 490 U.S. 386 (1989), to tie its PPCT discussion to constitutional limits. Ex. 1 at 7–8. The training testimony supplies, in terms, the legal conclusion that *Renfroe* excludes.

That answer is his framework. He agreed that the "cornerstone" of his opinion is a Fourth Amendment violation. Because of it, "it doesn't matter what the standards are because they would have been violated, as well." Ex. 2 at 68:14–24. Asked which LSP policy the troopers violated, he answered, "Any policy they had on use of force, they were in violation of it." *Id.* at 145:7–10. And when Plaintiff's counsel asked whether the training "requires them, officers, to comply with the Fourth Amendment," he said, "Yes. It does." *Id.* at 179:22–180:1.

The Middle District has drawn this line for Grafton himself, three times. In *Fetty*, it excluded all four of his case-specific opinions. "In each opinion, Grafton finds facts and/or draws legal conclusions regarding the reasonableness and necessity of Defendants' purported conduct." It confined him to "applicable standards and well-established police policy and procedure." 518 F. Supp. 3d at 930, 934.

*Kelly* and *Jones* did the same. In *Kelly*, the plaintiff promised Grafton would say only that force "was used in violation of established police practices and training." The court excluded his reasonableness opinion anyway, because a policy violation "has no direct causal link to the officer's at the moment decision-making." "[F]or the same reasons," it excluded his opinion that the force violated the sheriff's use-of-force policy. 2022 WL 263565, at *2. *Jones v. Lollis* ruled that Grafton "will not be permitted to give opinion testimony that certain acts or omissions violate the law or the Constitution." It barred this statement: "PPCT is consistent with Constitutional restrictions on use of force by law enforcement." No. 18-885, 2020 WL 3469105, at *2 (M.D. La. June 25, 2020).

*Fetty* already drew the line Brown asks for. Grafton "is certainly qualified and may testify as to applicable standards and well-established police policy and procedure." But he "will not be permitted to offer opinions that draw legal conclusions, make findings of fact, or address the credibility of any witness." 518 F. Supp. 3d at 934. Brown asks for the same line.

The supplemental report is that relabel in real time. Grafton says the recordings gave him "no information which would change or alter my opinions." Ex. 5 at 2. He then changes the words of every opinion:

| | **November 23, 2025 report (Ex. 1)** | **September 10, 2026 supplement (Ex. 5)** |
|---|---|---|
| Opinion One | Troopers "failed to properly document this event by failing to document the force used"; Brown "dishonest"; troopers "did not let the truth get in the way" (at 5–7) | Troopers "failed to accurately document the force used" and "failed to comply with accepted law enforcement reporting standards and practices"; State Police "found this description to be completely untrue" (at 6–7) |
| Opinion Two | Officers "used excessive force that was not necessary or reasonable, all in violation of their police academy training" (at 7) | Force "was inconsistent with Louisiana POST training, accepted law-enforcement practices, PPCT control techniques" (at 8); "all of the force used by the troopers would be unnecessary force" (at 7) |
| Opinion Three | A trooper "violated his Taser training when he activated the Taser against Antonio Harris when Mr. Harris was not resisting" (at 8) | The deployment "was inconsistent with accepted law enforcement training, Taser training principles, and generally accepted police practices" (at 9) |
| Constitutional framing | Invokes *Graham v. Connor* (at 7–8) | PPCT "is consistent with Constitutional restrictions on the use of force"; *Graham* quoted (at 8–9) |
| New | — | No officer attempted "to prevent any excess of force" (at 9) |

The supplement still calls all force "unnecessary"—the excluded expert's word in *Renfroe*. Ex. 5 at 7; 974 F.3d at 598. It still frames PPCT as "consistent with Constitutional restrictions on the use of force by law enforcement." It still quotes *Graham*'s "objectively reasonable" test. Ex. 5 at 8–9. That PPCT sentence is one the Middle District barred Grafton from offering, in nearly the same words, in *Jones*. 2020 WL 3469105, at *2.

The supplement also adds a new legal conclusion. It says no officer "attempt[ed] to prevent any excess of force." Ex. 5 at 9. That is the bystander-liability question in the words of the legal test. Grafton has already testified that this intervention opinion rests on "generalized policing practice, not on any specific training or policy from the state police." Told that LSP adopted a

duty-to-intervene policy only after this arrest, he answered that "whether they had a policy or procedure," it was "a practice of good policing." Ex. 2 at 138:1–139:3.

Grafton may not testify that Brown violated the Constitution, used constitutionally excessive force, or acted unreasonably under the Fourth Amendment. And he may not say the same thing by calling it a training violation, in either report.

### B. Calling Brown "dishonest" is a credibility judgment reserved to the jury.

Grafton declares that Brown was "dishonest" and that the reporting troopers "did not let the truth get in the way." Ex. 1 at 6–7. Questioned by Plaintiff's counsel, he again dismissed Brown's account as "a lie, a total lie." Ex. 2 at 183:3–11. Those statements decide credibility. They explain no documentation standard.

An expert "may not opine on another witness's credibility because this testimony does not help the trier of fact, who can make its own credibility determinations." Applying it, this Court struck an expert's characterization of a party's statement as "suspicious." *Nale*, 505 F. Supp. 3d at 645–46 (quoting *Nagle v. Gusman*, No. 12-1910, 2016 WL 9411376, at *4 (E.D. La. Feb. 29, 2016)). "Suspicious" is mild next to "dishonest."

Grafton's endorsement of Bethea is the same error in the other direction. He "took Sergeant Bethea at his word just from his report." He "accepted the report as factual." Ex. 2 at 53:15–16, 180:19–22. He reasoned that LSP ordinarily protects its troopers, so an investigator who faulted four of them must have found actual fault. *Id.* at 70:12–23. He described how he learns of LSP events: "When an event occurs, I can make a few phone calls and I know pretty well what happened because these young men will tell me." *Id.* at 71:3–14. No such source appears in either report.

His credibility judgments are the foundation, not a footnote. He agreed that if Bethea was untruthful, his own opinions would be "groundless." *Id.* at 74:16–20. His statement that the

troopers "lied in their reports" rests on one report—Brown's, as quoted in Bethea's affidavit. *Id.* at 160:17–161:10. None of that is a technique for testing an investigation. It is confidence in one witness substituted for analysis. *Fetty* barred exactly this. Grafton may not address "the credibility of any witness," including through his "interpretation of evidence as supporting his conclusions as to the credibility of any witness or a particular version of the facts." 518 F. Supp. 3d at 934.

An expert may give "an opinion based upon factual assumptions, the validity of which are for the jury to determine." He may not testify "that a disputed fact actually occurred or that one witness is more credible than another." *Id.* at 933 (quoting *Chipley v. Brownlow*, No. 3:16CV901TSL-RHW, 2019 WL 11093776, at *4 (S.D. Miss. Apr. 25, 2019) (quoting *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006))). Grafton did the latter. The Court should bar his credibility judgments and separate any supported reporting-practice opinion from the accusation that Brown lied.

The supplemental report drops the word "dishonest" but not the judgment. It adopts the State Police finding that Brown's account was "completely untrue." It declares that "Trooper Brown's report failed to accurately describe the force used." It calls the arrest narrative "inconsistent with the force observable in the recorded evidence." Ex. 5 at 7. And Grafton reaffirms the first report in full: "I am confident my first report and the opinions are accurate." *Id.* at 2. Dropping the word did not drop the accusation.

### C. Grafton adopted Bethea's narrative without the investigation or the video, so his opinions lack sufficient facts or data.

Rule 702(b) requires an opinion "based on sufficient facts or data." Rule 703 lets an expert rely on information from others when experts in the field reasonably would. Grafton's categorical conclusions about all force far outrun the work he did.

An expert's reliance on inadmissible material from another witness "does not pass muster under Rules 702 and 703" in three circumstances. The material "is from a witness testifying at the same trial." It "is critical to the expert's testimony." And it "is not independently verified by the expert." An opinion built on it is "likewise tainted." *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 26 F.4th 256, 269 & n.10 (5th Cir. 2022). Grafton's testimony presents the reliability concerns identified in *Taxotere*. Bethea's account was critical to Grafton's opinions, and Grafton did not independently verify it before reaching them.

First, Grafton did not review the investigation his report lists. He reviewed quotations in an arrest document and assumed they matched the underlying reports. Ex. 2 at 159:6–24, 171:21–172:3. Asked whether his report could stand without Bethea's, he answered, "Not without his report and what he puts in it because I relied on it." *Id.* at 171:21–172:3. He requested no additional materials. *Id.* at 172:4–5. Bethea's report, he said, "wasn't all I needed," but "it was something that I relied on." *Id.* at 172:13–18.

The rest was news clips and memory. He found the clips by an internet search. He could not say whether they were edited. He did not dispute that they held under two minutes of Harris footage, part of it from a camera that fell and blurred. *Id.* at 46:19–47:7, 48:21–23, 62:24–63:17, 126:4–12. For the rest of Bethea's narrative, he was "going by the trooper's investigation here, what he said." *Id.* at 60:5–66:24.

He had none of the material an analyst would need. He had no personnel files, training records, deposition testimony, or deputies' reports. He did not interview Harris. He did not know that a deputy had also drive-stunned Harris, or that the deputy's report described Harris as forcibly resisting. *Id.* at 101:18–102:6, 123:19–124:16, 128:20–23. Yet he agreed that an analyst needs "all

of those facts" to tell intentional force from incidental contact. *Id.* at 142:6–14. Bethea's account was critical, and Grafton did not verify it.

Second, the gaps concern the very acts he evaluates. He could not identify the source of his report's reference to kicks. He did not know the number or locations of the TASER drive-stuns. Ex. 2 at 80:24–81:23. As to Brown, he named one act: "the application of a flashlight to the back and head area." He agreed it was described as pressing, not a strike. He had not seen video of it. He could not say what was happening at that moment. He did not know how long it lasted or which hand Brown used. *Id.* at 175:1–176:22, 177:16–178:1. His only basis for saying metal touched Harris was Bethea. *Id.* at 76:6–9.

Third, the administrative file supplies no finding against Brown. It records that the investigation was discontinued after Brown resigned, before interviews or a conclusion. Ex. 4 at HARRIS2788. It neither exonerates Brown nor validates Bethea's narrative.

The supplemental report confirms the basis of the opinions rather than changing it. It says Grafton has now watched the recordings. Ex. 5 at 1, 7, 9. They gave him "no information which would change or alter" opinions formed on Bethea's narrative. *Id.* at 2. The report describes nothing the recordings show—no timestamp, no sequence, no act by Brown. Every fact attributed to Brown remains Bethea's language, quoted. *Id.* at 4–5. The only video-based sentences are conclusions: Harris "was not resisting, which is supported by the video footage." *Id.* at 7, 9. Watching recordings after reaching a conclusion, and reporting only that it survived, is not analysis. It is the same adopted narrative with a longer reading list.

Rule 703 also limits what Grafton may repeat to the jury. Reliance on inadmissible information does not make that information admissible through the expert. The proponent may disclose it to the jury only if its value in helping the jury evaluate the opinion "substantially

outweighs" its prejudicial effect. Fed. R. Evid. 703. The rule "provides a presumption against disclosure." Fed. R. Evid. 703 advisory committee's note to 2000 amendment. This Court has applied it: hearsay "is not admissible simply because it is repeated in [an] Expert Report." *Nale*, 505 F. Supp. 3d at 643. Grafton therefore cannot serve as a conduit for Bethea's accusations, findings, or credibility judgments. Those assertions explain no methodology. They tell the jury which version of disputed events to believe: that Brown lied, that Harris did not resist, and that the State Police found Brown's account "completely untrue." Ex. 5 at 4–5, 7.

Nor does expert testimony help the jury when Grafton merely narrates what a recording depicts. The jury can view the same recordings. It can decide whether Harris resisted and whether Brown's written account matches what they show. Expertise may explain a professional standard; it is not needed to narrate video or to resolve factual conflicts the jury can see for itself. Fed. R. Evid. 702(a); *Kelly*, 2022 WL 263565, at *2 ("An opinion by Grafton supplants the jury's fact-finding and is not necessary nor helpful to the trier of fact.").

Plaintiff will say these points go to weight. Since the 2023 amendment, the sufficiency of an expert's basis is a question the Court decides first. Fed. R. Evid. 702(b) & advisory committee's note to 2023 amendment. An opinion that repeats one investigator's narrative, without the investigation or any analysis of the video, is the investigator's conclusion wearing an expert's credentials.

### D. Grafton identified no governing standard and applied none to any act attributed to Brown.

Rules 702(c) and (d) require reliable principles and methods, reliably applied to the facts. Even assuming Harris had surrendered, Grafton had to identify the standard, explain how his experience supplies it, and apply it to Brown's particular conduct. He did none of that.

The report separates Brown's alleged hair-pulling and downward pressure from Harper's striking and DeMoss's lifting. Ex. 1 at 4–5. At deposition Grafton reduced Brown's conduct to one act: pressing a hand that held a flashlight against Harris's head and back. Ex. 2 at 176:5–8, 177:16–20. The only hair contact he knew of was DeMoss lifting Harris to his feet. *Id.* at 174:6–9.

Grafton's own categories do not reach that act. Soft empty-hand technique, he said, is taking an arm and cuffing. Jerking, pulling, taking to the ground, and hitting are hard-hand. *Id.* at 102:14–103:2. Pushing a subject down "could be considered hard hand. It would depend on how hard you pushed them." *Id.* at 103:9–16. He agreed that, in the descriptions he knows, hard-hand "required a strike of some kind." Soft-hand is "merely coming in contact with them and pushing." *Id.* at 104:20–25. He could point to no manual that draws the line: "I don't know that it would explain it, but I think it would." *Id.* at 104:9–19. His report says the proper procedure was "soft-hand techniques." Ex. 1 at 7.

So whether Brown's pressure was soft-hand or hard-hand depends, on Grafton's own account, on how hard he pressed. Grafton does not know how long it lasted, which hand was used, or what the video shows. Ex. 2 at 176:9–13, 177:21–178:1. Neither report says which provision governs. Neither says whether a flashlight in the hand changes the category, or how. His basis for saying a metal object touched Harris at all was "according to the investigative trooper." *Id.* at 75:13–76:9. Calling all force excessive does not say which standard governed any act attributed to Brown or how Brown departed from it.

When Grafton offered an opinion about where an officer stood when he fired, the Middle District excluded it. "An opinion by Grafton supplants the jury's fact-finding and is not necessary nor helpful to the trier of fact." *Kelly*, 2022 WL 263565, at *2. Harris himself could not say which

officer hit him or what Brown did: "I don't know which -- who Mr. Brown was, what -- what hit did he throw." He could not say which officer did or said what, had never seen any officer's face but Brown's, and did not recall whether any contact came before or after handcuffing. Ex. 3, Harris Dep. 142:1–143:2; *id.* at 133:4–9, 76:9–17. Grafton cannot fill those gaps without explaining how.

Nor did Grafton establish the benchmark. Asked what "accepted standards" his report invokes, he answered: "Any and all standards listed or in the manual in the Attorney General's Officer Guidebook. Any standards as to how to deal with the public, not to use force that's not necessary." Ex. 2 at 68:6–13. He did not know whether the troopers had received PPCT training. He could not give Brown's academy date. *Id.* at 18:11–19:13, 78:17–22.

His knowledge of LSP training is secondhand and dated. It comes from a State Police Commission seat he left in 2017. He has "no personal knowledge" of academy training from 2017 to 2020. He never taught use of force at the LSP Academy, and he agreed that the Commission does not set LSP policy. *Id.* at 76:10–77:3, 147:10–148:8. He identified no LSP policy number or version, and he did not know whether LSP policy referred to PPCT at all: "If they taught the material, then they accepted it." And he ultimately asserted that the troopers violated whatever version applied. *Id.* at 95:17–96:22, 99:1–22, 146:13–21.

The other sources he names are not standards either. The IACP material his report mentions is "a guideline. It's not an absolute requirement." The report gives no page, version, or year. *Id.* at 33:24–25, 36:1–5. The one policy he produced was a federal Department of Homeland Security policy that LSP never adopted. *Id.* at 161:18–162:18. Otherwise, "everything that I have learned over the years about use of force I applied." *Id.* at 165:12–15. His report says the proper procedure was to stand Harris up and use soft-hand techniques. Ex. 1 at 7. Yet he conceded that handcuffing

Harris on the ground would also have been proper. Ex. 2 at 79:22–80:7. A permissible alternative cannot be presented to the jury as a mandatory requirement.

Opinion Three has the same defect. Grafton did not produce the TASER manual, copied TASER material from earlier reports, and did not recall consulting the manual for this report. Ex. 2 at 94:2–95:16. He has never used a TASER outside an instructor course taken twelve to fifteen years ago, and he has never taught or developed TASER training. *Id.* at 25:9–12, 26:22–27:12. He thought one person had used a TASER, did not know which TASER policy version that trooper was trained under, and said the version "wouldn't be relevant." *Id.* at 40:2–15.

Opinion Three also never reaches Brown. The opinion does not identify Brown as a TASER user. Ex. 1 at 8. The supplement still attributes the deployment to "the Louisiana State Trooper" without naming one. Ex. 5 at 9. It supplies no training violation by Brown and no duty-to-intervene opinion against him. Brown seeks exclusion of its use against him, nothing more.

The supplemental report names manuals; it does not apply them. It cites POST, IACP, and TASER manuals and quotes one PPCT sentence on "soft empty hand control techniques." Ex. 5 at 3, 9. It still identifies no LSP policy. It still presents standing Harris up as "[p]roper procedure," *id.* at 8, after Grafton conceded that ground handcuffing was also proper, Ex. 2 at 79:22–80:7. It still lists "kicks," Ex. 5 at 9, whose source he could not identify, Ex. 2 at 80:24–81:23. And it still does not say which provision governed hair-pulling or downward pressure, or how Brown departed from it. Naming a manual is a start on Rule 702(c). It is not the application Rule 702(d) requires.

Between the facts Grafton assumed and the conclusions he reached lies an "analytical gap." *Joiner* lets a court refuse to bridge that gap on the expert's say-so. 522 U.S. at 146–47; *Hathaway*, 507 F.3d at 318–19. That is Opinions Two and Three as applied to Brown.

### E. Grafton is not a physician and reviewed no medical records, so he cannot attribute injuries or cardiac risk to particular acts.

Grafton's medical conclusions come from Bethea's report, not from medicine. His report says the alleged abuse contributed to Harris's injuries and calls head force blunt-force trauma. Ex. 1 at 8; Ex. 5 at 9. He reviewed no medical records; the blunt-force-trauma conclusion came from Bethea's report. Ex. 2 at 80:15–23. On TASER cardiac effects, he is neither a doctor nor a researcher; he relied on deaths after TASER exposure, not medical analysis: "I don't have to study it. I just look and see how many people have died." *Id.* at 152:9–21, 153:14–17, 154:5.

As applied to Brown, the injury language has nothing to attach to. Grafton attributed no strike to Brown. He agreed that pulling hair is not blunt-force trauma. *Id.* at 174:22–25, 176:5–8.

Expertise is opinion-specific. Grafton's police-practices experience does not qualify him to diagnose injuries or offer medical-causation opinions. A non-physician "may not opine" on the specific cause of death because "[h]e is not a medical doctor." *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565, 587 (E.D. La. 2005); *see Fetty*, 518 F. Supp. 3d at 934. The Court should exclude diagnoses, cardiac-causation opinions, and attribution of particular injuries to particular acts. Grafton may still describe a technique's recognized risks within his training expertise, and anyone may say that force can cause pain.

### F. Collateral accusations and post-event messages add prejudice, not expertise.

Grafton's collateral accusations have no foundation and no expert value. At deposition he raised an alleged reputation for force, an uncertain academy-cheating allegation, and a remark attributed to Brown's father. He admitted having no supporting document and no personal knowledge of dishonesty discipline. He agreed that the collateral matter did not concern this report. Ex. 2 at 167:14–169:24. None of it shows what Brown did during Harris's arrest or whether Grafton reliably applied a professional standard. To the extent Grafton invokes alleged prior

dishonesty, disciplinary history, unrelated misconduct, or generalized accusations against Brown or other troopers to suggest that Brown acted in keeping with that character here, the testimony is also impermissible propensity evidence. Fed. R. Evid. 404(a)(1), (b)(1).

The report's criticism of later mobile-data-terminal messages needs a purpose and a foundation. Ex. 1 at 8–9. Under *Graham*, the question is whether the officers' actions were "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." 490 U.S. at 397. This district excluded a use-of-force expert's opinion in *United States v. Firmin* "because it is based on facts that were not known to [the officer] at the time of the incident." No. 25-63, 2026 WL 983250, at *11 (W.D. La. Apr. 12, 2026). Grafton cannot convert the messages into expert proof of a Fourth Amendment violation.

Nor does Grafton know the medium. He testified that the troopers spoke on "an open microphone." Shown his report's reference to a mobile data terminal, he admitted he is "no authority on the communications." Ex. 2 at 181:15–23, 187:3–188:15.

The "professionalism" framing does not rescue the messages. The first report called them a "lack of professionalism." Ex. 1 at 9. The supplement elaborates that they are "inconsistent with the standards of professionalism, restraint, and accountability expected of law enforcement officers following a use-of-force incident." Ex. 5 at 10. No claim in this case turns on post-arrest professionalism. The opinion says nothing about whether any force was reasonable when used. It offers the jury a character judgment under an expert's name. Fed. R. Evid. 401–403. Whether the messages come in for some other purpose is a question for trial under Rule 403. Brown asks only that Grafton not be their vehicle.

**G. The weight-not-admissibility cases do not save these opinions.**

Plaintiff's best response is that the rest is for cross-examination. He will say experience can supply a method, and an expert may assume disputed facts. *Pipitone v. Biomatrix, Inc.* reversed the exclusion of an infectious-disease physician who used accepted diagnostic principles and ruled out alternative causes. It warned against turning gatekeeping into a trial on the merits. 288 F.3d 239, 247–50 (5th Cir. 2002). *Joseph v. Doe* let a use-of-force expert testify whether police standards or practices "were met or violated." No. 17-5051, 2021 WL 2313475, at *4 (E.D. La. June 7, 2021). Brown accepts all of that; he asks only for the missing benchmark and how Grafton applied it.

But *Joseph* also holds what *Renfroe* holds. The expert "may not testify that the conduct . . . met or failed to meet the applicable legal standard, such as the 'reasonableness'" of the force. *Id.* Grafton admitted that his training opinions do exactly that. Ex. 2 at 37:23–25. Cross-examination cannot cure a legal conclusion or a credibility verdict. *Renfroe*, 974 F.3d at 598.

The decisions that treated basis and application as weight share two features this case lacks. They are *Holmes v. Reddoch*, No. 19-12749, 2023 WL 2742155, at *4–6 (E.D. La. Mar. 31, 2023) (police-practices expert); *Arnold v. Alvarado*, No. 22-3332, 2024 WL 2864392, at *2, *4 (E.D. La. June 6, 2024) (defense neurosurgeon in an excessive-force case); and *MCI*, 403 F. Supp. 3d at 556–57 (cable-damage causation expert). *Holmes* and *MCI* predate the amendment. *Arnold*, decided in 2024, quoted the superseded text of Rule 702 and repeated the pre-amendment weight formulation. And none involved an expert who conceded that his standards testimony is a Fourth Amendment conclusion. *Ritchie v. City of Pineville*, No. 1:11-CV-2081, 2014 WL 11379574, at *2 (W.D. La. Oct. 27, 2014), denied a pretrial motion as to Grafton and reserved objections for trial. It predates the amendment and had no deposition record like this one.

### H. The supplemental report is a late rewrite, not a correction, and Rule 37(c)(1) excludes it.

The rules require the expert's complete opinions and bases by the disclosure deadline; Rule 26(e) is not a vehicle for materially new opinions masquerading as supplementation. A retained expert's report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Supplementation is a duty to correct a disclosure that "in some material respect . . . is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A). For experts, that duty "extends both to information included in the report and to information given during the expert's deposition." Fed. R. Civ. P. 26(e)(2). The same subdivision sets the outside date for a true supplement: "by the time the party's pretrial disclosures under Rule 26(a)(3) are due." *Id.* That deadline governs when a correction must be made. It does not make a post-deposition rewrite a correction.

The Fifth Circuit draws the same line. Supplemental disclosures "are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information." *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 371 (5th Cir. 2016) (quoting *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996)). A second report whose "analysis and opinions . . . were largely new rather than supplementary" is not a supplement under Rule 26(e). It is untimely. *Id.* at 372. A party that fails to disclose as the rules require "is not allowed to use that information . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Four factors guide that decision: the explanation for the failure, the importance of the testimony, the potential prejudice, and whether a continuance can cure it. *C.F. Bean*, 841 F.3d at 371.

Every deadline that could have covered this report had passed. As Part III recounts, Grafton was deposed on May 22, 2026, under a May 27 expert-deposition deadline. Doc. 93; Ex. 2 at 1.

The July 24 order set discovery completion for September 4 and *Daubert* and expert-deposition deadlines for September 11. Doc. 123 at 15. It directed that "[a]ll other deadlines which have passed shall be shown as such." *Id.* That sentence left expired expert-disclosure deadlines where they were. The August 5 minute entry confirmed that the reopening covered only the Bethea, Meyer, and Bradley depositions and already-propounded written discovery. Doc. 128.

The supplement is not a correction. It withdraws no opinion; it says the opposite. Ex. 5 at 2. It corrects no error in the first report. It repeats one: the first report's claim to have reviewed an investigation Grafton admitted he never had. *Id.*; Ex. 2 at 159:6–24. It names recordings and reports no analysis of them. What it does is answer the deposition. Every opinion he rewrote is one he was cross-examined on that day.

The timing was not substantially justified. The recordings have existed since the May 2020 arrest. Grafton dates their delivery from counsel to August 10, 2026. Ex. 5 at 1. Plaintiff has offered no reason why his expert did not have them before the deposition, or before the July 24 order that left passed deadlines in place. Doc. 123 at 15. Nothing prevented Plaintiff from seeking leave. The docket reflects no motion for leave to serve a supplemental report.

The timing was not harmless. Grafton dated the supplement September 10, 2026, the day before the *Daubert* deadline. Ex. 5 at 1; Doc. 123 at 15. The limited discovery reopening had already closed on September 4. Doc. 128. Brown could not depose Grafton on the rewrite. A report served on the eve of the challenge deadline, after the only deposition and after every reopening the Court allowed, is the definition of prejudice.

The Fifth Circuit reversed an exclusion in *C.F. Bean* for three reasons. The report came before the discovery deadline and months before trial. The opponent's late production explained the delay. And the expert was the party's only witness on the defect. 841 F.3d at 372–74. Each fact

is reversed here. The report came after every deadline and after the only deposition. The recordings existed for six years, and Plaintiff has offered no reason for the delay. And the supplement, by its author's account, changes nothing. Ex. 5 at 2.

Because the supplement changes no opinion and adds no reasoning, the rulings requested in Parts IV.A through IV.F reach it either way. If the Court concludes that the supplement matters, Brown asks that it be struck under Rule 37(c)(1). At a minimum, Grafton should be confined to the opinions and bases in the November 23, 2025 report and produced for a deposition limited to the supplement, at Plaintiff's expense, before any Rule 104(a) hearing. That is the cure *C.F. Bean* contemplated: a limited reopening, with costs and fees to the party that must redo its work. 841 F.3d at 375.

## V. Conclusion

The Court should exclude Opinions One, Two, and Three and their case-specific conclusions as offered against Brown. It should strike the supplement under Rule 37(c)(1) and confine Grafton to general police standards. If any general-practices testimony remains, it may not equate a training departure with a Fourth Amendment violation or put Bethea's narrative before the jury as Grafton's basis. Grafton may tell the jury what well-trained officers do. He may not tell it what the Constitution requires, or whom to believe.

Respectfully submitted,

LIZ MURRILL, ATTORNEY GENERAL

By: _/s/ Joshua J. Dara, Jr._
Joshua J. Dara, Jr. (#35739)
jdara@goldweems.com
Steven M. Oxenhandler (#28405)
soxenhandler@goldweems.com
Michael J. O'Shee (#10268)
moshee@goldweems.com
R. Morgan Briggs (#38161)
mbriggs@goldweems.com
Connor C. Headrick (#38265)
cheadrick@goldweems.com
GOLD WEEMS LAW FIRM
2001 MacArthur Drive
P.O. Box 6118
Alexandria, LA 71307-6118
Telephone: (318) 445-6471
Facsimile: (318) 445-6476
ATTORNEYS FOR JACOB BROWN

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of September 2026, the foregoing was filed electronically with the Clerk of Court by using the CM/ECF system. Notice of this filing will be sent to all parties who participate in electronic filing by operation of the Court's electronic filing system.

_/s/ Joshua J. Dara, Jr._
**COUNSEL**